FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOREDANA RANZA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>NIKE, INC., an Oregon corporation;<br>NIKE EUROPEAN OPERATIONS<br>NETHERLANDS, B.V., a foreign<br>corporation,<br>*Defendants-Appellees*. | No. 13-35251<br><br>D.C. No.<br>3:10-cv-01285-<br>AC<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
March 4, 2015—Portland, Oregon

Filed July 16, 2015

Before: Raymond C. Fisher, Richard A. Paez
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Fisher

# SUMMARY[*]

## Personal Jurisdiction/Forum Non Conveniens

The panel affirmed the dismissal, on grounds of lack of personal jurisdiction and *forum non conveniens*, of a complaint alleging sex and age discrimination in the workplace in violation of Title VII and the Age Discrimination in Employment Act.

The alleged discriminatory conduct occurred in the Netherlands. The panel held that the contacts with Oregon of the plaintiff's employer, a foreign subsidiary of Nike, Inc., were insufficient to make the subsidiary amenable to general personal jurisdiction there. In addition, the plaintiff did not show that the subsidiary was an alter ego of Nike, and thus that the district court could attribute Nike's contacts with the forum state to the foreign subsidiary for the purpose of exercising general personal jurisdiction over the subsidiary.

The panel affirmed the dismissal of claims against Nike under the doctrine of *forum non conveniens* because the Netherlands provided a more convenient forum than Oregon, and the Dutch Equal Treatment Commission was an adequate alternative forum and had already considered and rejected the plaintiff's claims.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Richard C. Busse (argued) and Kirsten Rush, Busse & Hunt, Portland, Oregon, for Plaintiff-Appellant.

Amy Joseph Pedersen (argued) and Laura E. Rosenbaum, Stoel Rives LLP, Portland, Oregon; Leonard J. Feldman and Charles E. Gussow, Stoel Rives LLP, Seattle, Washington, for Defendants-Appellees.

**OPINION**

FISHER, Circuit Judge:

Plaintiff Loredana Ranza appeals the district court's dismissal of her complaint alleging sex and age discrimination in the workplace in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3, and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623. Ranza brought claims in the District of Oregon against her former employer, Nike European Operations Netherlands, B.V. (NEON), and NEON's parent company, Nike, Inc., which is headquartered in Oregon. The alleged discriminatory conduct occurred in the Netherlands.

We first hold NEON's contacts with the state of Oregon are insufficient to make it amenable to general personal jurisdiction there, pursuant to *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). We then decide under what circumstances a court may attribute a parent company's contacts with the forum state to its foreign subsidiary for the purpose of exercising general personal jurisdiction over the subsidiary.

We hold a court may do so upon a showing that the subsidiary is an alter ego of its parent, consistent with *Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001). Because Ranza has not shown NEON is Nike's alter ego, we affirm the dismissal of the claims against NEON for lack of personal jurisdiction. Finally, we affirm the dismissal of the claims against Nike under the doctrine of *forum non conveniens* because the Netherlands provides a more convenient forum than Oregon to hear Ranza's claims, the Dutch Equal Treatment Commission is an adequate alternative forum and it has already considered and rejected Ranza's claims.

## BACKGROUND

Nike is a global brand of footwear, apparel and sports equipment whose headquarters are in Oregon. NEON is a wholly owned subsidiary of Nike, organized as a private limited liability company under the law of the Netherlands. NEON enters into licensing agreements with Nike to sell Nike-branded products primarily in Europe.

Ranza is a United States citizen who resided in the Netherlands during the events giving rise to this action and has since moved to Germany. NEON hired her in September 1996 as a product line sales manager after a series of interviews with both NEON and Nike executives. She underwent four months of training with Nike in the United States before she began her job with NEON at the company's office in Hilversum, the Netherlands. Ranza alleges she was subjected to sex and age discrimination during her time at NEON and was terminated in October 2008 in retaliation for opposing this discrimination.

As required under Dutch law, NEON sought approval from a court located in Hilversum before terminating Ranza. Ranza was represented by counsel at this proceeding and was afforded a hearing before the Court of Hilversum. The court found Ranza's termination was "neutral," i.e., that no party was at fault, and granted NEON permission to terminate her employment. The court also awarded Ranza approximately $205,000 in severance pay. Although NEON asked the Dutch court to rule on whether Ranza had a legitimate claim of discrimination, the court expressly declined to do so, stating that such a claim should be brought before the Dutch Equal Treatment Commission (ETC) or a court in the United States.

While the Court of Hilversum decision was pending, Ranza initiated a claim of discrimination before the ETC. According to an English translation of an ETC publication, the ETC is a "special 'enforcement institution[]'" established by the Dutch government to help implement the country's equal treatment laws.[1] It is separate from the judiciary but shares some features in common with a judicial tribunal: its nine commissioners have salary protections, decisional independence and insulation from firing by the government. It "provides easy access to an independent and expert judgement in matters of alleged unequal treatment and/or discrimination, both for individuals and for private and public organisations and institutions." Its proceedings are "less formal than a court procedure," but litigants are permitted to submit evidence, present witnesses and argue their case at a hearing. When investigating a complaint, the ETC can make direct inquiries of the parties and call on independent experts to evaluate the facts.

---

[1] Dutch law prohibits discrimination in employment on the basis of sex and age, among other protected statuses.

The ETC does not provide direct relief, however; its power is in its ability to persuade the parties or a court of law to act in accordance with its conclusions and recommendations. It determines whether unlawful discrimination has occurred and publishes reasoned opinions applying the law to the facts of a case. It can also make recommendations to prevent future discrimination. But it has no authority to enforce its judgments or recommendations. After the Commission issues a judgment finding discrimination, it follows up with the parties to determine whether the defendant has taken remedial actions and to encourage compliance. Although the ETC cannot impose penalties or other sanctions on a defendant who fails to remedy discrimination, a complainant may try to persuade a court of law to enforce an ETC judgment, either through money damages or injunctive relief. In such a case, the Commission's determination that discrimination has occurred "can be of great value," according to the Commission, in part because the ETC takes considerable effort in drafting its judgments to make them persuasive to the parties and the courts. Additionally, the ETC itself may bring legal action in Dutch courts to enforce its judgments.

Here, the ETC held a hearing on Ranza's claims of discrimination in June 2009. Ranza and NEON representatives were present at the hearing (along with English translators) and were represented by counsel. At the conclusion of the hearing, the ETC initiated an investigation and requested further information from the parties. The ETC also asked its independent job evaluation expert to investigate Ranza's claims and provided the expert's findings to the parties to give them an opportunity to respond. After concluding its investigation, the ETC issued a thorough opinion in June 2010, finding NEON "ha[d] not discriminated

[against] L. Ranza during her work on the basis of sex or age, nor ha[d] [it] acted in violation of the victimization prohibition [under Dutch law]." The opinion addressed each of Ranza's allegations, including her claims that NEON discriminated against her when it promoted a younger, less qualified male instead of her; that NEON paid Ranza less than her more junior male coworkers; and that NEON fired her because of her sex, age and in retaliation for her complaints of discrimination. The opinion presented the facts, law and positions of the parties on each of Ranza's claims before concluding they lacked merit.

While the two Dutch proceedings were pending in 2008, Ranza filed an employment discrimination claim with the U.S. Equal Employment Opportunity Commission (EEOC) against NEON, later adding parent-company Nike as a respondent. The EEOC denied the claim, stating it was deferring to the findings of the Dutch ETC.

Ranza then filed suit against NEON and Nike in the District of Oregon, and the case was referred to a magistrate judge. Nike and NEON moved to dismiss for lack of personal jurisdiction and other pleading defects. After permitting jurisdictional discovery, the magistrate judge concluded the court lacked personal jurisdiction over NEON because the Dutch company did not have sufficient contacts with Oregon to justify general jurisdiction. Although he found NEON was Nike's "alter ego," which is a concept borrowed from corporate law that courts use to impute a local entity's contacts to its foreign affiliate to extend jurisdiction to the latter, he nevertheless determined it would be unreasonable to exercise jurisdiction over NEON because of the burden it would place on the company and the inconvenience of litigating claims in which the relevant

events and witnesses are "chiefly" located abroad. As for the claims against Nike, the magistrate judge rejected Nike's argument that Ranza had failed to exhaust her administrative remedies. But he recommended granting Nike's motion to dismiss because Ranza presented insufficient evidence that Nike controlled NEON, which is a prerequisite for extending liability under Title VII and the ADEA to the activities of an American company's foreign subsidiary. He alternatively recommended the entire case be dismissed for *forum non conveniens*, finding Ranza had an adequate and more convenient alternative forum for her claims in the Netherlands.

Reviewing the magistrate judge's findings de novo, the district court agreed it lacked personal jurisdiction over NEON and that Ranza had failed to state a claim against Nike under Title VII or the ADEA, dismissing her claims with prejudice. The court declined to consider or adopt the magistrate judge's recommendations regarding exhaustion of administrative remedies or *forum non conveniens*, determining the lack of jurisdiction over NEON and the failure to state a claim against Nike fully resolved the case. Ranza appealed. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review de novo a district court's dismissal for lack of personal jurisdiction. *See Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014). "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). "Where, as here,

the defendant's motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'" *Id.* (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)). A plaintiff may not simply rest on the "bare allegations of [the] complaint." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)). But uncontroverted allegations must be taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.*

## DISCUSSION

## I. Personal Jurisdiction over NEON

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over [defendants]." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Oregon law authorizes personal jurisdiction over defendants to the full extent permitted by the United States Constitution. *See* Or. R. Civ. P. 4 L. We therefore inquire whether the District of Oregon's exercise of jurisdiction over NEON "comports with the limits imposed by federal due process." *Daimler*, 134 S. Ct. at 753.

For the exercise of personal jurisdiction over a defendant, due process requires that the defendant "have certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The strength of contacts

required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction. *See Daimler*, 134 S. Ct. at 754; *Martinez*, 764 F.3d at 1066.

Specific jurisdiction exists when a case "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984). It "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (alterations and internal quotation marks omitted). Hence, it is "specific" to the case before the court. General jurisdiction, in contrast, permits a court to hear "any and all claims" against a defendant, whether or not the conduct at issue has any connection to the forum. *Id.*; *see Martinez*, 764 F.3d at 1066 ("[G]eneral jurisdiction . . . allows a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." (internal citations and quotation marks omitted)).[2] As Ranza does not argue NEON's contacts with Oregon give rise to or relate to her cause of action, specific jurisdiction is not at issue. She must therefore show Oregon's exercise of general jurisdiction over NEON comports with due process.

Because the assertion of judicial authority over a defendant is much broader in the case of general jurisdiction

---

[2] General jurisdiction is also referred to as "all-purpose" jurisdiction, *Daimler*, 134 S. Ct. at 757, whereas specific jurisdiction is sometimes referred to as "case-specific" or "case-linked" jurisdiction, *id.*; *Goodyear*, 131 S. Ct. at 2851.

than specific jurisdiction, a plaintiff invoking general jurisdiction must meet an "exacting standard" for the minimum contacts required. *CollegeSource*, 653 F.3d at 1074. "[G]eneral jurisdiction requires affiliations so continuous and systematic as to render the foreign corporation essentially at home in the forum State, *i.e.*, comparable to a domestic enterprise in that State." *Daimler*, 134 S. Ct. at 758 n.11 (citations, internal quotation marks and alterations omitted). Such contacts must be "constant and pervasive." *Id.* at 751. The paradigmatic locations where general jurisdiction is appropriate over a corporation are its place of incorporation and its principal place of business. *See id.* at 760. "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Martinez*, 764 F.3d at 1070 (citing *Daimler*, 134 S. Ct. at 761 n.19).

Ranza argues NEON's contacts with Oregon are sufficiently pervasive to subject it to general jurisdiction there. Alternatively, she contends NEON is sufficiently close to its parent company that Nike's contacts with Oregon, which are sufficiently pervasive, should be attributed to NEON. We reject both arguments.

## A.  NEON's Contacts with Oregon

Oregon is neither NEON's place of incorporation nor its principal place of business. NEON is a limited liability company registered in the Netherlands whose principal business activity is marketing athletic footwear, apparel and equipment outside the United States. Its offices are in the Netherlands and it pays taxes there. It has over a thousand employees in that country. Nonetheless, Ranza argues NEON's business contacts with Oregon make it "essentially at home" in Oregon. She points to the presence of "20 to 27

NEON employees working in Oregon on expatriate assignments [to Nike] at any one time between 2006 and 2008," NEON employees' average of "47 trips per month to Oregon" to conduct business meetings between 2006 and 2011, NEON's "entering into contracts whereby Nike in Oregon is to act as NEON's agent" in various business arrangements and the presence of NEON's products in Oregon stores.

Although these business contacts with Oregon may have sufficed to establish specific jurisdiction over NEON had Ranza's claims arisen from these contacts, they are not pervasive enough to establish jurisdiction for *any* cause of action against NEON. The Supreme Court has held business contacts that are "in some sense continuous and systematic" cannot establish general jurisdiction unless they are "so continuous and systematic as to render [the corporation] essentially at home in the forum State." *Daimler*, 134 S. Ct. at 761 (internal quotation marks omitted); *see also Goodyear*, 131 S. Ct. at 2856 ("A corporation's 'continuous activity of some sorts within a state,' . . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" (quoting *Int'l Shoe*, 326 U.S. at 318)).

Two Supreme Court cases demonstrate why NEON's contacts with Oregon are insufficient. In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984), the Court held a Texas court could not assert general personal jurisdiction over a Colombian corporation when the corporation's contacts were limited to executive travel to and from Texas, accepting bank account checks drawn on a Houston bank, purchasing helicopters, equipment and training services from a Texas corporation, and sending employees to Texas for training. *See id.* at 416–18. Similarly, in

*Goodyear*, the Court held a North Carolina court could not assert general jurisdiction over foreign subsidiaries of an American tire manufacturer even though some of the tires manufactured by those subsidiaries were distributed in North Carolina. *See* 131 S. Ct. at 2854–57.

NEON's relationship to Oregon is similar to the defendants' relationships with the forum states in *Helicopteros* and *Goodyear*. NEON sends employees and products into Oregon and engages in commercial transactions there, but such business activity is not so pervasive as to render it "essentially at home" in Oregon. *Daimler*, 134 S. Ct. at 761; *see id.* at 760–61 (rejecting the proposition that general jurisdiction is appropriate wherever a corporation "engages in a substantial, continuous, and systematic course of business"); *id.* at 761–62 nn.18 & 20 (noting that "doing business" has long been abandoned as the test for general jurisdiction). Moreover, the general jurisdiction inquiry examines a corporation's activities worldwide – not just the extent of its contacts in the forum state – to determine where it can be rightly considered at home. *See id.* at 762 n.20 ("General jurisdiction . . . calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them."). In contrast with NEON's extensive contacts in Europe, where the vast majority of its employees and business activities are located, the company's limited activities in Oregon do not render it "essentially at home" there.[3]

---

[3] Although the parties and the district court discussed at length whether the exercise of general jurisdiction would be "reasonable" in this instance, *Daimler* clarified that the reasonableness test articulated in *Asahi Metal Industry Co. v. Superior Court of California, Solano County*, 480 U.S.

### B. Imputing Nike's Contacts to NEON

We next address Ranza's attempt to establish general jurisdiction over NEON by attributing Nike's Oregon contacts to its foreign subsidiary through the agency and alter ego theories borrowed from the veil-piercing doctrine of corporate law.

The existence of a parent-subsidiary relationship is insufficient, on its own, to justify imputing one entity's contacts with a forum state to another for the purpose of establishing personal jurisdiction. *See Doe v. Unocal Corp.*, 248 F.3d 915, 925–26 (9th Cir. 2001). "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). As a general principle, corporate separateness insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership of the subsidiary. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998). However, in certain limited circumstances, the veil separating affiliated entities may be pierced to impute liability from one entity to the other. *See id.* at 62; *Anderson v. Abbott*, 321 U.S. 349, 362–63 (1944). As in the context of corporate liability, the veil separating affiliated corporations may also be pierced to exercise personal jurisdiction over a foreign defendant in certain limited circumstances. *See Unocal*, 248 F.3d at 926; *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 & n.18 (5th Cir. 2002) (collecting cases from various

---

102, 113–16 (1987), is reserved for the specific jurisdiction inquiry and plays no role in the general jurisdiction inquiry. *See Daimler*, 134 S. Ct. at 762 n.20.

circuits).  The parties dispute what those circumstances are and whether the Nike-NEON relationship fits within them.

Before the Supreme Court's *Daimler* decision, this circuit permitted a plaintiff to pierce the corporate veil for jurisdictional purposes and attribute a local entity's contacts to its out-of-state affiliate under one of two separate tests: the "agency" test and the "alter ego" test.  *See Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011), *rev'd sub nom. Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).  The agency test required a plaintiff to show the subsidiary "perform[ed] services that [were] sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services."  *Id.* (quoting *Unocal*, 248 F.3d at 928).  The Supreme Court invalidated this test.  *See Daimler*, 134 S. Ct. at 759.  It held that focusing on whether the subsidiary performs "important" work the parent would have to do itself if the subsidiary did not exist "stacks the deck, for it will always yield a pro-jurisdiction answer."  *Id.*  Such a theory, the Court concluded, sweeps too broadly to comport with the requirements of due process.  *See id.* at 759–60.  The agency test is therefore no longer available to Ranza to establish jurisdiction over NEON.

In contrast to the agency test, the Court left intact this circuit's alter ego test for "imputed" general jurisdiction.  *See id.* at 759 (noting, without opining on, the fact that "several Courts of Appeals" employ an alter ego test).  The alter ego test is designed to determine whether the parent and subsidiary are "not really separate entities," such that one entity's contacts with the forum state can be fairly attributed to the other.  *Unocal*, 248 F.3d at 926.  The "alter ego . . .

relationship is typified by parental control of the subsidiary's internal affairs or daily operations." *Id.* We examine Nike's relationship with NEON under this alter ego test.

### 1. Applying the Alter Ego Theory to a Foreign Subsidiary

As an initial matter, NEON argues Ranza is asking us to apply the alter ego test in an unprecedented fashion. Rather than seeking to impute a subsidiary's local contacts to a foreign parent, which is the traditional application of the alter ego test, *see, e.g.*, *id.* at 925–26, Ranza seeks to impute a local parent's contacts to a foreign subsidiary. Yet, like the typical application of the alter ego test, Ranza supports her imputation theory based on the parent Nike's allegedly extensive control over its subsidiary NEON. Thus, whereas the alter ego test has traditionally been used to bring a controlling parent into a controlled subsidiary's home forum, Ranza attempts to use the test to bring a controlled subsidiary into the controlling parent's home forum.[4]

---

[4] The Supreme Court confronted a similar imputation argument in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, where the plaintiff family members of a group of North Carolina boys who died in a bus accident in France asked a North Carolina court to exercise general jurisdiction over Goodyear USA's foreign subsidiaries who manufactured the allegedly defective tires. *See* 131 S. Ct. at 2851–52. But the Court declined to reach the question of whether Goodyear USA's ties to North Carolina could be imputed to its foreign subsidiaries, because the plaintiffs waived that argument by failing to raise it in lower court proceedings. *See id.* at 2857 (noting respondents failed to raise their "single enterprise" theory until after certiorari was granted). The Court ultimately held North Carolina courts could not exercise general jurisdiction over Goodyear's foreign subsidiaries, relying only on the foreign subsidiaries' insufficient contacts with the forum state. *See id.*

Ranza offers no binding authority applying the alter ego test in reverse. She does, however, highlight persuasive reasoning from a district court opinion addressing this issue in the context of a multidistrict antitrust dispute in which the plaintiffs sought to establish general jurisdiction over foreign subsidiaries of domestic candy manufacturers:

> [O]ur sister courts have consistently exercised alter ego jurisdiction over either the parent *or the subsidiary* based upon the other's connections to the forum. This broader formulation reflects the common-sense principle that the court should not defer to corporate boundaries that the defendant itself has disregarded. When two organizations assume alter ego status, they effectively operate as a single, unified entity notwithstanding the superficial corporate boundaries between them. The consolidated entity is subject to jurisdiction in any forum where it operates regardless of which formal corporation maintains an in-forum presence. Courts commonly exercise alter ego jurisdiction over a foreign parent based upon its control of an in-forum subsidiary, but reversal of the entities' geographic placement does not restrict the application of alter ego principles.

*In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 599 n.25 (M.D. Pa. 2009) (citations and internal quotation marks omitted).

This is sound reasoning. Because we treat the parent and subsidiary as "not really separate entities" if they satisfy the alter ego analysis, *Unocal*, 248 F.3d at 926, there is no greater justification for bringing the parent into the subsidiary's forum than for doing the reverse. *See* Lea Brilmayer & Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency*, 74 Calif. L. Rev. 1, 13–15 (1986) (discussing how the theory of corporate "merger" justifies imputing the entities' contacts in either direction).[5] In fact, exercising general jurisdiction over both entities in the parent's forum is just as defensible (if not more so) under due process principles as haling the parent into the subsidiary's forum. If the two entities are to be treated as a single enterprise, the stronger candidate for the "home" of that enterprise is likely where the controlling parent most closely affiliates. *Cf. Daimler*, 134 S. Ct. at 760 ("With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" (alterations in original) (quoting Lea Brilmayer et al., *A General Look at General Jurisdiction*, 66 Tex. L. Rev. 721, 735 (1988))). And the enterprise as a whole should reasonably foresee being subject to suit for all of its activities – even those unrelated to the forum – where it most closely affiliates. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are

---

[5] The Brilmayer and Paisley article has been credited for its "considerable influence on courts and the practicing bar." Lonny Sheinkopf Hoffman, *The Case Against Vicarious Jurisdiction*, 152 U. Pa. L. Rev. 1023, 1031 (2004); *see also Third Nat'l Bank in Nashville v. WEDGE Grp. Inc.*, 882 F.2d 1087, 1094 (6th Cir. 1989) (Keith, J., concurring) (adopting the article's theory for imputing one entity's contacts to its affiliate for the exercise of personal jurisdiction).

such that he should reasonably anticipate being haled into court there.").[6]

We hold the alter ego test may be used to extend personal jurisdiction to a foreign parent *or* subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate. *See In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 598–99 & n.25.[7] We therefore turn to the alter ego inquiry.

## 2. Alter Ego Application

To satisfy the alter ego test, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and

---

[6] This is not to suggest there could be only one "home" for alter ego entities that the court treats as a single enterprise for the purposes of jurisdiction. The Supreme Court has avoided suggesting general jurisdiction is available in only one location for a corporation. *See Daimler*, 134 S. Ct. at 760 ("*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business . . . ."); *id.* ("These bases afford plaintiffs recourse to *at least one* clear and certain forum in which a corporate defendant may be sued on any and all claims." (emphasis added)).

[7] NEON argues we expressly rejected an attempt to impute an in-state parent's contacts to its foreign subsidiary in *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299 (9th Cir. 1986). In *Fields*, we held "a parent corporation's ties to a forum do not create personal jurisdiction over the subsidiary" and called such ties "irrelevant" to the jurisdictional inquiry for the subsidiary. *Id.* at 302. As a general proposition, this is true. But *Fields* did not address a situation, as here, in which a subsidiary is alleged to be the alter ego of its parent. If a court determines the entities should not be treated as separate under the alter ego analysis, the parent's contacts do become relevant to subsidiary, and vice versa. If the alter ego test is not met, however, *Fields* applies.

ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" *Unocal*, 248 F.3d at 926 (alterations in original) (quoting *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996)). The "unity of interest and ownership" prong of this test requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Id.* (internal quotation marks omitted). This test envisions pervasive control over the subsidiary, such as when a parent corporation "dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." *Id.* (internal quotation marks omitted). Total ownership and shared management personnel are alone insufficient to establish the requisite level of control. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

In *Unocal*, we held a plaintiff does not meet the "unity of interest and ownership" prong when the evidence shows only "an active parent corporation involved directly in decision-making about its subsidiaries' holdings," but each entity "observe[s] all of the corporate formalities necessary to maintain corporate separateness." 248 F.3d at 928. The evidence in that case included the parent's

> (1) involvement in its subsidiaries' acquisitions, divestments and capital expenditures; (2) formulation of general business policies and strategies applicable to its subsidiaries, including specialization in particular areas of commerce; (3) provision of loans and other types of financing to

subsidiaries; [and] (4) maintenance of overlapping directors and officers with its subsidiaries . . . .

*Id.* at 927. This level of involvement was insufficient to negate the entities' separate personalities through the observance of corporate formalities, such as adequate capitalization at each entity and the proper documentation of transactions between the entities. *See id.* at 927–28.

Likewise, Ranza has presented no evidence Nike and NEON fail to observe their respective corporate formalities. Each entity leases its own facilities, maintains its own accounting books and records, enters into contracts on its own and pays its own taxes. Each has separate boards of directors, and Ranza has been able to identify only one director who served on both company's boards simultaneously. Some employees and management personnel move between the entities, but that does not undermine the entities' formal separation. *See Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) (holding there was no alter ego relationship where some directors for one entity had sat on the board of the other). Ranza has presented no evidence that NEON is undercapitalized, that the two entities fail to keep adequate records or that Nike freely transfers NEON's assets, all of which would be signs of a sham corporate veil. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393–94 (9th Cir. 1984); *Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984).

As in *Unocal*, Ranza has not shown Nike "dictates every facet of [NEON's] business," including "routine matters of day-to-day operation." *Unocal*, 248 F.3d at 926. To be sure,

Nike is heavily involved in NEON's operations. Nike exercises control over NEON's overall budget and has approval authority for large purchases; establishes general human resource policies for both entities and is involved in some hiring decisions; operates information tracking systems all of its subsidiaries utilize; ensures the Nike brand is marketed consistently throughout the world; and requires some NEON employees to report to Nike supervisors on a "dotted-line" basis. NEON, however, sets its own prices for its licensed Nike products, takes and fulfills orders for its licensed products using its own inventory, negotiates its own contracts and licenses, makes routine purchasing decisions without Nike's consultation and has its own human resources division that handles day-to-day employment issues, including hiring and firing decisions.[8]

"A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Id*. at 927. Thus, we have held "no alter ego relationship was created where the parent company guaranteed loans for the subsidiary, reviewed and approved major decisions, placed several of its directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions." *Id.* at 928 (citing *Kramer*

---

[8] While the defendants' motion to dismiss was pending before the magistrate judge, Ranza sought to augment the record with NEON's Articles of Association, which allegedly demonstrated NEON did not have unfettered independent hiring and firing authority. The magistrate judge denied the motion and the district court upheld that ruling. The district court did not abuse its discretion by doing so, because the issue of control over personnel was squarely before the court and Ranza had ample opportunity to submit this evidence earlier. *See EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 989–90 (9th Cir. 2014).

*Motors*, 628 F.2d at 1177). This case is similar. The evidence demonstrates Nike is active in macromanagement issues but does not show that Nike directs NEON's routine day-to-day operations, and nothing suggests the entities failed to observe their separate corporate formalities. The weight of the evidence therefore persuades us Nike and NEON are not in an alter ego relationship.[9]

Ranza makes much of NEON's principal business being the marketing and distribution of Nike products in Europe and other locations, relying on a statement in *Unocal* suggesting a parent exercises the requisite amount of control over a subsidiary when it uses the subsidiary as "a marketing conduit." *See* 248 F.3d at 926. In making this statement, however, *Unocal* cited a district court case that used the marketing conduit theory to assert *specific* jurisdiction over the foreign corporation based upon its deliberate placement of products into the forum state. *See id.* (citing *United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 359 (C.D. Cal. 1983)). We have not previously applied the marketing conduit theory to assert *general* jurisdiction over a foreign defendant, and we decline to do so here. The Supreme Court has since made clear that, to comport with the requirements of due process, the general jurisdiction inquiry is much more demanding than that for specific jurisdiction. *See Daimler*, 134 S. Ct. at 757–58. Exercising general jurisdiction over a foreign subsidiary merely because it markets products on behalf of its local parent resembles the agency theory of imputed jurisdiction the Court rejected in *Daimler*. *See* 134 S. Ct. at 759 (invalidating the attribution of forum

---

[9] Because Ranza has not satisfied the "unity of interest and ownership" prong of the alter ego test, we need not analyze the "fraud or injustice" prong. *See Unocal*, 248 F.3d at 928.

contacts from a subsidiary to its parent when the subsidiary "performs services that are sufficiently important" to the parent that the parent would perform them in the absence of the subsidiary).

In sum, Nike's involvement in NEON, though substantial, is insufficient to negate the formal separation between the two entities such that they are functionally one single enterprise. Ranza therefore may not attribute Nike's Oregon contacts to NEON for the purpose of personal jurisdiction. And NEON's contacts with Oregon, standing alone, are insufficient to make it amenable to general jurisdiction in that state. We therefore hold the district court properly declined to exercise personal jurisdiction over NEON.

## II. Exhaustion of Administrative Remedies

Before we address Ranza's claims against Nike, we must first address Nike's argument that Ranza failed to exhaust her administrative remedies, which is a potential bar to jurisdiction. *See Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003) ("Although failure to file an EEOC complaint is not a complete bar to district court jurisdiction, substantial compliance with the exhaustion requirement is a jurisdictional pre-requisite."). We disagree with Nike's contention that Ranza's initial failure to name Nike as a respondent in her EEOC charge deprives us of jurisdiction over her Title VII and ADEA claims against Nike.

Because Oregon law provides an avenue for relief from discrimination also covered under the ADEA and Title VII, *see Pearson v. Reynolds School Dist. No. 7*, 998 F. Supp. 2d 1004, 1019 (D. Or. 2014), Ranza had 300 days within which to file her claim against Nike and NEON. *See* 29 U.S.C.

§ 626(d)(1)(B); 42 U.S.C. § 2000e-5(e)(1); *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 124 (1988) (interpreting these provisions in Title VII and the ADEA to extend the filing period to 300 days whether or not the claimant actually pursued state remedies).  She initially named only NEON in her claim filed with the EEOC on November 6, 2008.  She officially added Nike to her claim on November 30, 2009 – well after 300 days from the date of the last alleged act of discrimination, which was April 10, 2008.

Generally, failure to timely name a party in an EEOC filing deprives us of jurisdiction over that party because the party would not have had an opportunity to respond to the charges before the EEOC.  *See Sosa v. Hiraoka*, 920 F.2d 1451, 1458–59 (9th Cir. 1990).  There is an exception, however, when an unnamed party was on notice of the filing and "'should have anticipated' that the claimant would name [the party] in a Title VII suit."  *Id.* at 1459 (quoting *Chung v. Pomona Valley Cmty. Hosp.*, 667 F.2d 788, 792 (9th Cir. 1982)).  Such is the case here.  Nike was put on notice when the EEOC sent "Nike, Inc." a notice of claim on December 2, 2008 that Nike acknowledged having received.  This date fell within 300 days of April 10, 2009.  At that point, Nike should have anticipated Ranza would name it in a Title VII suit.  *See id.*  Ranza's failure to specifically name Nike in the EEOC complaint therefore does not deprive us of jurisdiction.

## III.    Forum Non Conveniens

In contrast to NEON, Nike is unquestionably subject to personal jurisdiction in Oregon.  Nike nonetheless argues we should affirm the district court's dismissal of Ranza's claims against it under the doctrine of *forum non conveniens*.  The magistrate judge agreed with Nike's *forum non conveniens*

argument, but the district court declined to address the issue because it dismissed on other grounds. We may affirm, however, "on any ground raised below and fairly supported by the record." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013) (quoting *Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009)). We have discretion to reach *forum non conveniens* even if the district court declined to consider it. *See Harris Rutsky & Co. Ins. Servs.*, 328 F.3d at 1135–36. It is proper to exercise that discretion here because "the record is sufficiently developed and the issue has been presented and argued to us." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1117–18 (9th Cir. 2002).

"To prevail on a motion to dismiss based upon *forum non conveniens*, a defendant bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). A plaintiff's choice of forum is generally entitled to deference, especially where the plaintiff is a United States citizen or resident, because it is presumed a plaintiff will choose her "home forum." *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981). This deference is "far from absolute," however, and it is within the court's discretion to decide whether a foreign forum is more convenient. *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 767 (9th Cir. 1991); *see Piper Aircraft*, 454 U.S. at 255 n.23 ("A citizen's forum choice should not be given dispositive weight . . . ."). The selection of a United States forum by an expatriate United States citizen residing permanently abroad, like Ranza, is entitled to less deference because "it would be less reasonable to assume the choice of forum is based on convenience." *Iragorri v. United Techs. Corp.*, 274 F.3d 65,

73 n.5 (2d Cir. 2001) (en banc). Moreover, that Ranza unsuccessfully litigated her claims before the Dutch ETC and now pursues a remedy in federal court raises an inference, at least, that she is engaging in forum shopping, which also permits us to defer less to her choice of forum. *See Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 695 (9th Cir. 2009).

We have held an "alternative forum is deemed adequate if: (1) the defendant is amenable to process there; and (2) the other jurisdiction offers a satisfactory remedy." *Carijano*, 643 F.3d at 1225. Ranza does not argue Nike is not amenable to process in the Netherlands, and thus the first prong of this test is not in dispute. *Cf. Dole Food Co*, 303 F.3d at 1118. Instead, she only argues the Netherlands is an inadequate forum under the second prong because it cannot provide her with a satisfactory remedy. Specifically, she argues the Dutch forum was inadequate because the Court of Hilversum decided only whether her employment could be terminated, and the Dutch Equal Treatment Commission (ETC) had no authority to provide her any relief. We agree that the Court of Hilversum is not an adequate alternative forum under these facts because it expressly declined to adjudicate her discrimination claims. We disagree, however, that the ETC provided an inadequate forum. This is especially true because Ranza herself chose to litigate her discrimination claims before the ETC, which thoroughly reviewed those claims.

"[T]ypically, a forum will be inadequate only where the remedy provided is so clearly inadequate or unsatisfactory, that it is no remedy at all." *Carijano*, 643 F.3d at 1226 (some internal quotation marks omitted) (quoting *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1178 (9th Cir. 2006)). "[T]hat the law, or the remedy afforded, is less favorable in

the foreign forum is not determinative." *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 666 (9th Cir. 2009) (citing *Piper Aircraft*, 454 U.S. at 247). A foreign forum must merely provide "some" remedy. *See id.* In *Loya*, for example, a local Mexican court was deemed adequate to adjudicate the plaintiff's breach of contract and wrongful death claims, even though the potential recovery in Mexico was far lower than in the United States, the plaintiff was a United States citizen and any recovery could be swallowed by legal fees. *See id.* at 664–66. And in *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001), we held that New Zealand's administrative compensation system for accident victims was adequate, even though it was not a judicial remedy. *See id.* at 1144–45.

The Netherlands has authorized the ETC, an administrative body, to adjudicate claims of violation of Dutch equal protection laws. Although the proceedings are less formal than court proceedings, claimants are afforded a hearing and an opportunity to submit evidence and present witnesses. Ranza took full advantage of this opportunity and litigated her case before the ETC, with the assistance of local counsel. The ETC launched an investigation into Ranza's claim and employed an expert to evaluate her employer's practices. In a thorough opinion, the Commission applied the law to Ranza's claims and determined there was no basis for relief.

Although the ETC does not have the authority to award damages or enforce its judgments when it identifies discrimination, it publishes its findings, coordinates with both governmental and non-governmental bodies and "actively follow[s] up" with employers to ensure compliance with its findings and to remedy any discrimination. The ETC

publication Ranza provided states that a prevailing claimant can ask a Dutch court to enforce an ETC judgment, through damages and injunctive relief, and the Commission may pursue claims on behalf of claimants. Had Ranza prevailed before the ETC, these remedies would have been available to her. Even if these remedies proved less generous than those available to a prevailing plaintiff in a Title VII and ADEA action in the United States, they nevertheless represent "some remedy" and are therefore adequate under the *forum non conveniens* inquiry. *See Carijano*, 643 F.3d at 1225–26 (noting the requirement that the alternative forum provide "some remedy" is "easy to pass"); *Loya*, 583 F.3d at 666 (holding an available remedy is adequate even if the potential recovery is considerably less than that available in the United States).[10]

The private interest factors in the *forum non conveniens* inquiry also favor dismissal. These include "(1) relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of hostile witnesses, and cost of obtaining attendance of willing witnesses;

---

[10] Ranza also appeals the district court's denial of her request to augment the record with a declaration from a Dutch attorney addressing the prospect of pursuing a direct action for discrimination in Dutch courts. Her purpose in introducing the declaration was to rebut a declaration from NEON's Dutch attorney suggesting direct action in Dutch court was available to Ranza. The district court did not abuse its discretion because Ranza herself had already introduced into the record the ETC publication, which says Dutch courts can hear claims of discrimination. The issue was therefore before the court and Ranza had ample opportunity and reason to submit the declaration much earlier. *See EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 989–90 (9th Cir. 2014). In any event, in our de novo review of the adequacy of the Dutch forum, we do not rely on NEON's declaration regarding direct court action in the Netherlands, so Ranza's justification for supplementing the record is moot.

(3) possibility of viewing subject premises; [and] (4) all other factors that render trial of the case expeditious and inexpensive." *Id.* at 664 (quoting *Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 703 (9th Cir. 1995)). Although Nike is located in Oregon, the alleged discrimination took place at the offices of NEON in the Netherlands. As the magistrate judge correctly noted, the relevant documents and witnesses are mostly located abroad. The plaintiff does not even reside in the United States. So relative to the Netherlands, Oregon is an inconvenient forum for the parties.

Finally, the public interest factors in the *forum non conveniens* inquiry favor dismissal as well. These include "(1) administrative difficulties flowing from court congestion; (2) imposition of jury duty on the people of a community that has no relation to the litigation; (3) local interest in having localized controversies decided at home; (4) the interest in having a diversity case tried in a forum familiar with the law that governs the action; [and] (5) the avoidance of unnecessary problems in conflicts of law." *Loya*, 583 F.3d at 664 (quoting *Creative Tech.*, 61 F.3d at 703–04). Ranza is a citizen of the United States, which has an interest in protecting its citizens from discrimination and remedying discrimination by foreign subsidiaries controlled by American parent companies. *See* Pub. L. No. 102-166, 105 Stat. 1071, § 109 (amending Title VII and the ADEA to cover discrimination against U.S. citizens when working for a foreign company controlled by a U.S. company).[11] But the Netherlands also has a strong interest in ensuring that the

---

[11] We assume, for the purposes of this inquiry only, that Title VII and the ADEA would apply to discrimination alleged to have taken place at Nike's foreign subsidiary NEON.

businesses operating within its borders do not engage in discrimination. The Dutch government's establishment of the ETC to enforce its equal protection laws exemplifies this interest, as does the ETC's considerable involvement in this very case. Moreover, the United States' interest is significantly diminished here because the district court would be relitigating claims already decided in a foreign proceeding. *Cf. Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) ("This Court has long recognized that '[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.'" (alteration in original) (quoting *Baldwin v. Traveling Men's Ass'n*, 283 U.S. 522, 525 (1931))).

On balance, the inconvenience of litigating this case in Oregon, the inefficiency and inadvisability of relitigating claims the Dutch ETC has already decided, and the adequacy of the ETC as an alternative forum establish that the District of Oregon is not an appropriate forum for Ranza's claims. Our conclusion is reinforced by the lesser degree of deference due the forum choice of a U.S. citizen residing permanently abroad. *See Iragorri*, 274 F.3d at 73 n.5. We therefore affirm the dismissal of the claims against Nike.[12]

---

[12] Because we affirm the dismissal of claims against Nike under *forum non conveniens*, we need not address whether Ranza failed to state a claim for the extraterritorial application of Title VII and the ADEA against Nike. Consequently, we also decline to address Ranza's argument that the district court should have granted her motion to amend the complaint to add another claim of discrimination under Title VII. We also need not address whether we should dismiss the claims in the interest of international comity.

## CONCLUSION

The district court properly dismissed Ranza's claims against NEON for lack of general personal jurisdiction. NEON is a Dutch company that mostly operates outside the United States.  Its contacts with Oregon are not "so continuous and systematic as to render [it] essentially at home" there. *Daimler AG v. Bauman*, 134 S. Ct. 746, 758 n.11 (2014).  Although we conclude a plaintiff may impute a local entity's contacts to its foreign affiliate if it demonstrates an alter ego relationship between the entities, Ranza has not made that showing.  Nike, a corporation that is based in Oregon, is heavily involved in NEON's macromanagement, but it is not so enmeshed in NEON's "routine matters of day-to-day operation" that the two companies should be treated as a single enterprise for the purpose of jurisdiction.  *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001).

We further hold the district court properly dismissed Ranza's claims against Nike, albeit for a different reason than the district court cited.  Under the circumstances, the Netherlands provided an adequate and more convenient alternative forum in which to litigate Ranza's claims, thus justifying Nike's dismissal under the *forum non conveniens* doctrine.

**AFFIRMED.**