**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GEORGE WILLIAMS; LORENDA
OVERMAN; GERALD CHIARIELLO, II;
STEVE OETEGENN; CHARLES
PENCINGER; BRIAN GILDERMAN;
JOSEPH RAMOS; ADAM DANIEL
JACKS; PHILIP KIRSOPP; WILLIAM
KRATZ; WILLIAM NEFF; JAMES R.
KRAPF, on behalf of themselves and
all others similarly situated,
*Plaintiffs-Appellants*,

and

MARK D. COOPERMAN; GERALD L.
WASHINGTON; ERNEST PAUL
CAMILLERI, JR.; SCOTT MARKOWITZ;
JOE DIORIO; THOMAS BLATT;
MATTHEW J. BONZELLA; JOE
GARSETTI,
*Plaintiffs*,

v.

YAMAHA MOTOR CO. LTD.;
YAMAHA MOTOR CORPORATION,
U.S.A.,
*Defendants-Appellees*.

No. 15-55924

D.C. No.
2:13-cv-05066-
BRO-VBK

OPINION

Appeal from the United States District Court
For the Central District of California
Beverly Reid O'Connell, District Judge, Presiding

Argued and Submitted February 16, 2017
Pasadena, California

Filed March 24, 2017

Before:  MILAN D. SMITH, JR. and JOHN B. OWENS,
Circuit Judges, and ALVIN K. HELLERSTEIN, District
Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Alvin K. Hellerstein, United States Senior District
Judge for the Southern District of New York, sitting by designation.

## SUMMARY[**]

**Personal Jurisdiction / Consumer Fraud Law**

The panel affirmed the district court's dismissal of Yamaha Motor Co. Ltd. (YMC) for lack of personal jurisdiction, and Fed. R. Civ. P. 12(b)(6) dismissal of plaintiffs-appellants' claims against Yamaha Motor Corporation, U.S.A. (YMUS), in an action alleging violations of federal and state warranty law and other claims, brought by appellants who purchased allegedly defective outboard motors that YMC designed and manufactured in Japan and that YMUS imported and marketed in California.

The panel held that the district court lacked general jurisdiction over YMC. Specifically, the panel held that YMC itself did not have sufficient contacts with California for the exercise of general jurisdiction. The panel also held that appellants failed to plead sufficient facts to make out a prima facie case that YMC and YMUS were "alter egos." The panel noted that even assuming that YMUS's contacts could be imputed to YMC, that did not, on its own, suffice to establish general jurisdiction.

The panel held that the district court lacked specific jurisdiction over non-resident YMC. Specifically, the panel held that appellants did not allege any action that YMC "purposefully directed" at California. Assuming that some standard of agency continued to be relevant to specific jurisdiction after *Daimler AG v. Bauman*, 134 S. Ct. 746, 759

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

n.13 (2014), the panel held that appellants failed to make out a prima facie case for any such agency relationship between YMC and YMUS and its in-state connections.

The panel held that appellants failed to plead a prima facie case of consumer fraud.  The panel held that contrary to the district court, appellants adequately pleaded YMC and YMUS's presale knowledge of the alleged defect.  The panel also held, however, that appellants failed to plausibly plead that the alleged defect caused an unreasonable safety hazard.

### COUNSEL

Van Bunch (argued), Bonnett Fairbourn Friedman & Balint P.C., Phoenix, Arizona; Charles Clinton Hunter and Debra Brewer Hayes, The Hayes Law Firm PC, Houston, Texas; for Plaintiffs-Appellants.

Theane Evangelis Kapur (argued), Michael Holocek, and Timothy W. Loose, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendant-Appellee.

**OPINION**

M. SMITH, Circuit Judge:

This appeal challenges two separate rulings by the district court: the dismissal of Defendant-Appellee Yamaha Motor Co. Ltd. (YMC) for lack of personal jurisdiction, and the dismissal of Plaintiffs-Appellants' claims against Defendant-Appellee Yamaha Motor Corporation, U.S.A. (YMUS) pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth in this opinion, we affirm the district court on both accounts.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants are a group of twenty named plaintiffs who purchased "first-generation . . . four stroke outboard motors" (the Class Motors) manufactured by YMC from 2000 to 2004.  Appellants brought suit against YMC, which designed and manufactured the Class Motors in Japan, and YMC's wholly-owned subsidiary, YMUS, which imported and marketed them in California.  Appellants allege that the Class Motors contained an inherent design defect that caused severe, premature corrosion in the motors' dry exhaust system.  Appellants assert that this defect caused the motors to fail after between 500 to 700 hours of use, even when properly serviced and maintained, when absent this defect an outboard motor would have an expected useful life of at least 2000 hours.  Although the alleged defect manifests early in an engine's expected lifespan, the average recreational boater only uses her engine an average of 100 hours per year. Accordingly, the defect typically will not manifest until the three-year warranty period has expired.  Appellants assert on appeal that Appellees knew of the dry exhaust defect prior to the sales of the Class Motors to Appellants, and that the defect poses an unreasonable safety hazard.

Appellant Williams filed the initial complaint on behalf of himself and all others similarly situated on July 15, 2013, naming YMC and YMUS as defendants. The complaint asserted claims for violations of federal and state warranty law; California's Consumer Legal Remedies Act, California Civil Code § 1750; and California's Unfair Competition Law, California Business and Professions Code § 17200.

Appellees filed a motion to dismiss, in response to which Appellants filed an amended complaint. YMUS then filed a second motion to dismiss for failure to state a claim, and YMC filed a motion to dismiss for lack of personal jurisdiction. While these motions were pending, the district court consolidated this matter with two similar cases and vacated all pending motions, after which Appellants filed a consolidated class action complaint. The consolidated complaint contained, in addition to the claims asserted in the initial complaint, ten new statutory claims from five different states, as well as claims for negligence and unjust enrichment.

YMUS subsequently filed a third motion to dismiss for failure to state a claim, and YMC filed a second motion to dismiss for lack of personal jurisdiction. On August 19, 2014, the district court granted in part YMUS's motion, dismissing Appellants' warranty and consumer fraud claims, and granting YMC's motion in its entirety. Appellants then filed their first amended complaint, to which YMUS responded with a fourth motion to dismiss. The district court granted YMUS's motion entirely, but granted Appellants leave to replead their consumer fraud claims.

Finally, on February 2, 2015, Appellants filed their second amended complaint (SAC), to which YMUS responded with its fifth motion to dismiss for failure to state a claim. On April 29, 2015, the district court granted

YMUS's motion and dismissed Appellants' only remaining claims with prejudice.  Appellants now appeal the district court's grant of YMC's motion to dismiss for lack of personal jurisdiction, and its grant of YMUS's fifth motion to dismiss Appellants' consumer fraud claims.

## JURISDICTION AND STANDARD OF REVIEW

We exercise jurisdiction over appeals from final decisions of the district court pursuant to 28 U.S.C. § 1291. We review *de novo* a district court's dismissal of a party for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  We similarly conduct *de novo* review of "a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Walker v. Beard*, 789 F.3d 1125, 1131 (9th Cir. 2015).

## ANALYSIS

### I.   The District Court Lacked General Jurisdiction Over YMC

Federal courts apply state law to determine the bounds of their jurisdiction over a party.  *See* Fed. R. Civ. P. 4(k)(1)(A).   California's long-arm statute permits the exercise of jurisdiction to the full extent that such exercise comports with due process.  Cal. Code Civ. P. § 410.10.

Under *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011), courts have general jurisdiction over a foreign corporation only if the corporation's connections to the forum state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  *Id*. at 919.  A corporation's "continuous activity of

some sorts within a state is [generally] not enough to support the demand that the corporation be amenable to suits unrelated to that activity." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945). Rather, in the paradigmatic circumstance for exercising general jurisdiction, the corporate defendant is incorporated or has its principal place of business in the forum state. *Goodyear*, 564 U.S. at 924.

In *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), the Supreme Court considered for the first time "whether a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary." *Id.* at 759. The plaintiffs sought to sue Daimler, a German corporation, in California on the basis that Daimler's subsidiary's contacts could be attributed to Daimler under an agency theory, thereby establishing Daimler's "continuous and systematic" presence within California. *Id.* at 752. Daimler's subsidiary, MBUSA, served as Daimler's exclusive U.S. importer and distributor and had multiple California facilities. *Id.* We found general jurisdiction over Daimler under an agency theory, applying a test that asked whether MBUSA's services were "sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 921 (9th Cir. 2011) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) (emphasis omitted)).

The Supreme Court reversed our finding of general jurisdiction, emphasizing that the test for general jurisdiction asks whether a corporation is essentially "at home" in the forum state. *Daimler*, 134 S. Ct. at 754, 757. The Supreme Court assumed that MBUSA could be considered "at home" in California, and that its in-state contacts could be attributed

to Daimler, but it rejected a theory that would permit "the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.'" *Id*. at 760–61. In so doing, the Court noted that while general jurisdiction is not strictly limited to a corporation's place of incorporation or principal place of business, those exemplars illustrate the need for predictability in jurisdiction and "afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id*. at 760.

Subsequently, in *Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015), we considered whether an in-state corporation's contacts could be attributed to its foreign subsidiary to establish general jurisdiction over the subsidiary. *See id.* at 1065. We stated that while *Daimler* invalidated our previous "agency" test, it "left intact" the alternative "alter ego test for 'imputed' general jurisdiction." *Id*. at 1071. We made clear, however, that the parent-subsidiary relationship does not on its own establish two entities as "alter egos," and thus does not indicate that general jurisdiction over one gives rise to general jurisdiction over the other. *Id*. at 1070 (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Rather, we held that "the alter ego test may be used to extend personal jurisdiction to a foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate." *Id*. at 1073 (emphasis omitted). To satisfy this test, "a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Id*. (quotation marks and alterations omitted).

We first consider whether YMC itself has sufficient contacts with California for the exercise of general jurisdiction. We conclude that it does not.

YMC is incorporated and has its principal place of business in Japan, and has no offices or employees in California. Considering YMC's California sales, "the general jurisdiction inquiry examines a corporation's activities worldwide—not just the extent of its contacts in the forum state—to determine where it can be rightly considered at home." *Ranza*, 793 F.3d at 1071 (citing *Daimler*, 134 S. Ct. at 762 n.20). Appellants' own evidence indicates that YMC has 109 consolidated subsidiaries located in at least 26 different countries and spanning five continents. It further shows that in 2012, net sales in North America—a figure that includes sales in all 50 states and Canada, not merely in California—accounted for approximately 17% of YMC's total net sales. While the California market may be important for YMC, Appellants failed to submit evidence to support a finding that YMC is "at home" in California.[1]

Nevertheless, Appellants argue that YMUS's California contacts may be imputed to YMC for the purpose of establishing jurisdiction. Appellants fail, however, to plead facts sufficient to make out a prima facie case that YMC and YMUS are "alter egos." Appellants' complaint makes almost no factual allegations regarding the nature of the parent-subsidiary relationship, and the evidence Appellants

---

[1] This is particularly so in light of the Supreme Court's rejection of the "stream of commerce" theory for general jurisdiction. *Goodyear*, 564 U.S. at 927–29.

submitted in opposition to YMC's motion to dismiss did not provide any additional clarity.

Moreover, even assuming that YMUS's contacts could be imputed to YMC, this does not, on its own, suffice to establish general jurisdiction. In *Daimler*, the Court assumed that the subsidiary's in-state contacts could be imputed to the foreign parent, but nevertheless found the exercise of general jurisdiction inappropriate.[2] 134 S. Ct. at 760.

---

[2] Appellants cite out-of-circuit district court cases, *Barriere v. Juluca*, No. 12-23510-CIV, 2014 WL 652831 (S.D. Fla. Feb. 19, 2014), and *Associated Energy Group, LLC v. Air Cargo Germany GMBH*, 24 F. Supp. 3d 602, 607 (S.D. Tex. 2014), to argue that the district court had general jurisdiction over YMC due to (1) YMUS's status as a co-defendant in this case, (2) the allegation of in-state harm, and (3) YMC's status as a foreign corporation. These arguments lack merit. *Daimler*'s holding did not rest on whether the in-state entity was a party, and the location of the alleged harm has no role in the general jurisdiction analysis. Regarding YMC's status as a foreign corporation, *Daimler* and *Ranza* both also dealt with foreign corporations with no United States principal place of business.

Appellants further argue that YMUS's contacts with California render this case distinguishable from *Daimler*, because the subsidiary in *Daimler* was not a California corporation. Again, this is a distinction without a difference: The Supreme Court expressly assumed that the subsidiary in that matter was properly subject to general jurisdiction in California. *Daimler*, 134 S. Ct. at 760. Finally, Appellants point to numerous other lawsuits YMC has litigated in the United States. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199 (1996); *Rissew v. Yamaha Motor Co.*, 129 A.D.2d 94 (N.Y. App. Div. 1987); *Stephens v. Yamaha Motor Co.*, 627 P.2d 439 (Okla. 1981). But none of these cases found that California courts may exercise general jurisdiction over YMC. Accordingly, they have no relevance to the jurisdictional inquiry in this matter.

In short, the district court correctly found that it lacked general jurisdiction over YMC.

## II. The District Court Lacked Specific Jurisdiction Over YMC

The exercise of jurisdiction over a non-resident defendant requires that the defendant "have certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted).  In order for a court to have specific jurisdiction over a defendant, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).  The relationship between the defendant and the forum state "must arise out of contacts that the 'defendant [itself]' creates with the forum State." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Additionally, the requisite "minimum contacts" must be "with the forum State itself, not . . . with persons who reside there." *Id.*

We will exercise specific jurisdiction over a non-resident defendant only when three requirements are satisfied: (1) the defendant either "purposefully direct[s]" its activities or "purposefully avails" itself of the benefits afforded by the forum's laws; (2) the claim "arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction [] comport[s] with fair play and substantial justice, i.e., it [is] reasonable." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

Addressing the first prong of the specific jurisdiction analysis, Appellants do not allege any actions that YMC

"purposefully directed" at California.[3]  Appellees submitted unrebutted evidence in support of their Rule 12(b)(2) motion that YMC does not conduct any activities within the state of California, nor does it target California via marketing or advertising.  The only connection Appellants identify between YMC and California is via YMUS.  Accordingly, we must ask whether YMUS's in-state connections may be attributed to YMC under an agency theory for the purpose of establishing specific jurisdiction.[4]

While *Daimler* voided our agency approach for imputing contacts for the purpose of general jurisdiction, it left open the question of whether an agency relationship might justify the exercise of specific jurisdiction.  *Daimler*, 134 S. Ct. at 759 n.13 ("Agency relationships, we have recognized, may

[3] Appellants' citation to *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1197 (9th Cir. 1988), for the proposition that "a nonresident defendant may purposefully direct its conduct toward a forum state by marketing the product through a distributor who has agreed to act as the sales agent in the forum State" is unavailing.  The *Sinatra* court specifically found that the plaintiff actively directed the advertising and sales efforts of its in-state agent, thereby justifying the exercise of specific jurisdiction.  *Id.*  It contrasted this conduct with that found insufficient to support specific jurisdiction in *Asahi Metal Industry Co. v. Superior Court of Solano County*, 107 S. Ct. 1026 (1987).  The *Asahi* defendant knew that its products would be sold and used in California, and benefited economically from those sales, but "[t]he Court relied on the absence of any business solicitation or promotional conduct to determine that . . . the exertion of personal jurisdiction was unreasonable."  *Sinatra*, 854 F.2d at 1197 (citing *Asahi*, 107 S. Ct. at 1033).  The facts of the present matter bear far more similarity to those of *Asahi* than to those of *Sinatra*.

[4] As discussed *supra*, Appellants have failed to make a prima facie showing that YMC and YMUS are alter egos.  YMUS's contacts can thus only be attributed to YMC if we find that the agency theory of imputed contacts applies.

be relevant to the existence of *specific* jurisdiction"). Appellees point to *Walden*'s emphasis on the necessity of a relationship between the defendant *itself* and the forum state to suggest that YMUS's relationship to California cannot support specific jurisdiction over YMC. But *Walden* did not address an agency theory of jurisdiction. Rather, that case dealt with the scenario in which the connection between the defendant and the forum was provided only by the *plaintiff*, and could aptly be described as "random, fortuitous, or attenuated." 134 S. Ct. at 1123 (citation omitted). This contrasts sharply with the circumstance at hand, in which the relationship between the in-state entity and the defendant is that of a parent and a subsidiary purportedly acting as that parent's agent. If an agency theory of imputable contacts survives *Daimler* in the context of specific jurisdiction, then *Walden*'s directive that contacts must be directly between the defendant and the forum is inapposite, because imputing an in-state entity's contacts to the defendant would necessarily establish that direct connection.

Notwithstanding *Daimler*'s express reservation on the question of agency theory's application to specific jurisdiction, more than one district court within our circuit has expressed some uncertainty on that point post-*Daimler*, as "the rationale set forth in *Daimler* . . . would seem to undermine application of [our agency test] even in specific jurisdiction cases." *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 982 (N.D. Cal. 2016) (quoting *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01180-BLF, 2015 WL 4755335, at *5 (N.D. Cal. Aug. 11, 2015)).

As noted *supra*, our agency analysis asks whether the subsidiary "performs services that are sufficiently important to the foreign corporation that if it did not have a

representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Unocal*, 248 F.3d at 928 (internal quotation marks omitted).  The Supreme Court found in *Daimler* that, "[f]ormulated this way, the inquiry into importance stacks the deck, for it will always yield a pro-jurisdiction answer: Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do 'by other means' if the independent contractor, subsidiary, or distributor did not exist."  134 S. Ct. at 759 (internal quotation marks omitted). This criticism applies no less in the context of specific jurisdiction than in that of general jurisdiction.  Accordingly, *Daimler*'s reasoning is clearly irreconcilable with the agency test set forth in *Unocal*.  *See Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (holding that where a prior decision in our circuit "is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled.").  The *Daimler* Court's express recognition of the potential viability of agency relationships for establishing specific jurisdiction does not alter our holding.  While the Court reserved judgment on the viability of agency theory as a general concept, it did not suggest that our particular *formulation* for finding an agency relationship should survive in the context of specific jurisdiction.  To the contrary, the *Daimler* Court's criticism of the *Unocal* standard found fault with the standard's own internal logic, and therefore applies with equal force regardless of whether the standard is used to establish general or specific jurisdiction.

Assuming, however, that some standard of agency continues to be "relevant to the existence of *specific*

jurisdiction," *Daimler*, 134 S. Ct. at 759 n.13, Appellants fail to make out a prima facie case for any such agency relationship. Fundamental tenets of agency theory require that an agent "act on the principal's behalf and subject to the principal's control." Restatement (Third) Of Agency § 1.01 (2006); *see also Batzel v. Smith*, 333 F.3d 1018, 1035 (9th Cir. 2003) ("Agency requires that the principal maintain control over the agent's actions"). Accordingly, under any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities. *See, e.g.*, *Unocal*, 248 F.3d at 926; *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013). Appellants neither allege nor otherwise show that YMC had the right to control YMUS's activities in any manner at all.[5] Consequently, even assuming the validity of some formulation of agency analysis such that a subsidiary's contacts *could* be attributed to its parent, Appellants failed to establish specific jurisdiction over YMC.

## III.  Plaintiffs Failed to Plead a Prima Facie Case of Consumer Fraud

Federal Rule of Civil Procedure 8(a)(2) requires only that a plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief," such that the defendant receives "fair notice" of the claims against it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

---

[5] Appellants do allege that "Defendants . . . were the agents or employees of each other and were acting at all times within the course and scope of such agency and employment . . . and are legally responsible because of their relationship with their co-Defendants." This is, however, a conclusory legal statement unsupported by any factual assertion regarding YMC's control over YMUS (or regarding any other aspect of the parent-subsidiary relationship), and we accordingly do not credit it. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

(citation omitted). A sufficiently pleaded cause of action "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The requirement that a plaintiff provide "plausible grounds" for her claim does not, however, "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. On the contrary, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotation marks omitted).

Appellants' SAC asserts claims under a number of state consumer fraud statutes, each of which requires either an affirmative misrepresentation or an omission of material fact.[6] Appellants allege no affirmative misrepresentation. Rather, they rely entirely on YMUS's failure to notify consumers of the alleged dry exhaust defect. To state a claim for failing to disclose a defect, a party must allege "(1) the

---

[6] Appellants have asserted claims under the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; Massachusetts Consumer Protection Act, Mass. Gen. L., Ch. 93A, § 2; N.Y. Gen. Bus. L. § 349; North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*; Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.*; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*; Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.12, *et seq.*; Rhode Island Unfair Trade Practice and Consumer Protection Act, R.G.G.L. §§ 6-13.1.1, *et seq.*; Virginia Consumer Protection Act, Va. Code. Ann. §§ 59.1-200, *et seq.*; Maryland Consumer Protection Act, Md. Code, Com. L. §§ 13-301, *et seq.*; New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.*; and Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*

existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and that the manufacturer knew of the defect at the time a sale was made." *Apodaca v. Whirlpool Corp.*, No. 13-00725 JVS (ANx), 2013 WL 6477821, at *9 (C.D. Cal. Nov. 8, 2013); *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142–43 (9th Cir. 2012) (holding that where a defendant has not made an affirmative misrepresentation, a plaintiff must allege the existence of an unreasonable safety hazard and a causal connection between the defect and the hazard).

Contrary to the district court, we find that Appellants adequately pleaded Appellees' presale knowledge of the alleged dry exhaust defect. However, we also find that Appellants failed to plausibly plead that the alleged defect constituted an unreasonable safety hazard. We therefore affirm the district court's dismissal of Appellants' consumer fraud claims pursuant to Rule 12(b)(6).

### A. Appellants Adequately Pleaded Appellees' Presale Knowledge of the Alleged Dry Exhaust Defect

The SAC alleges that YMUS began receiving consumer complaints regarding dry exhaust corrosion as early as 2001. It states that "the complaints from owners regarding the dry exhaust corrosion in the First Generation Outboards were so frequent that individual Customer Relations supervisors personally handled as many as 40 or 50 different consumer complaints, or more, regarding the issue," which was an unusually high number of complaints for Yamaha to receive regarding corrosion "this soon in the life of the engines." The SAC goes on to explain that the high volume of calls led to the creation of "a marine-only customer relations service department in Kennesaw, Georgia, with approximately two

dozen customer service employees to assist in handling the complaints," and identifies Lindsey Foster as the Manager of Customer Relations who reviewed the complaints handled by the Kennesaw facility. Finally, the SAC explains how consumer complaints were recorded and transmitted by the Kennesaw facility so as to make YMUS management aware of the number and substance of the complaints, and states that Ms. Foster specifically reviewed the submitted complaints through YMUS's private Customer Relations Management (CRM) database.

The district court found that the alleged consumer complaints did not support a finding of YMUS's presale knowledge, and agreed with YMUS's characterization of Appellants' allegations of 2001 customer complaints as "inherently inconsistent with [their] overarching theory of the defect" because Appellants had "consistently alleged that the defect does not manifest until 500–700 hours of use, 'which for a typical consumer using the boat 100 hours a year would take *five to seven years* to achieve.'" *Williams v. Yamaha Motor Corp., U.S.A.*, 106 F. Supp. 3d 1101, 1114 (C.D. Cal. 2015) (emphasis added by district court)). The district court ignored, however, Appellants' allegation that "the corrosion problem (which typically took 500 to 700 engine hours to manifest) had surfaced first primarily among heavy users who used their engines much more than typical recreational boat owners' usage." It was not "inherently inconsistent" to allege that a subset of "heavy users" encountered the defect much sooner than the typical user otherwise would.

The district court also cited multiple cases, from within this circuit and elsewhere, to illustrate the disfavored nature of customer complaints as a basis for establishing a party's presale knowledge. These cases are, however,

distinguishable.  The district court particularly cited *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012), for its observation that "[s]ome courts have expressed doubt that customer complaints in and of themselves adequately support an inference that a manufacturer was aware of a defect," because "complaints posted on a manufacturer's webpage 'merely establish the fact that some consumers were complaining.'"  *Id.* at 1147 (quoting *Berenblat v. Apple, Inc.*, Nos. 08-4969 JF (PVT), 09-1649 JF (PVT), 2010 WL 1460297, at *9 (N.D. Cal. Apr. 9, 2010)).  The facts of *Wilson*, however, differ significantly from those alleged here: *Wilson* concerned fourteen complaints, and the plaintiffs did not identify "where or how the complaints were made" and did not provide dates for twelve of the complaints.  *Id.* at 1148.  We found that absent dates to indicate that the complaints were made pre-sale, and some evidence that defendant actually *received* the complaints, it would be speculative at best to find that the defendant knew of the alleged defect.  *See id.* at 1147.  Here, by contrast, Appellants gave at least approximate timing for the complaints, and explained in detail how those complaints were lodged, how YMUS responded, and the mechanism through which information travelled from consumers to YMUS management.[7]

---

[7] At oral argument, counsel for Appellees emphasized that while YMUS may have known of the dry exhaust corrosion, it did not know of an *unreasonable safety hazard*.  This argument elides two separate prongs of the test for consumer fraud: presale knowledge of a defect, and the status of that defect as an unreasonable safety hazard.  *See Apodaca*, 2013 WL 6477821, at *9.  In other words, counsel argued that the defect did not pose the safety risk necessary for a finding of consumer fraud.  As discussed *infra*, we agree.  That does not negate, however, YMUS's alleged presale knowledge of the premature corrosion itself.

*Wilson* did not hold that consumer complaints may never support an allegation of presale knowledge. On the contrary, it cited to—and distinguished—*Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG (MLGx), 2009 WL 5788762 (C.D. Cal. June 12, 2009), in which the plaintiff successfully alleged presale knowledge of a defect largely through its allegation that,

> Since 1999, [Defendant] has . . . constantly tracked the National Highway Traffic Safety Administration . . . database to track reports of defective Sonata sub-frames. From this source, [Defendant] knew that its 1999–2004 Sonatas were experiencing unusually high levels of sub-frame deterioration, steering control arm separation, steering loss, and highway accidents.

*Wilson*, 668 F.3d at 1146 (quoting *Cirulli*, 2009 WL 5788762, at \*4). The facts alleged by the SAC are remarkably similar to those alleged in *Cirulli*, and provide an even stronger basis for finding presale knowledge because rather than tracking an outside database, YMUS is alleged to have set up its own proprietary complaint-tracking system to account for a similarly "unusually high level[]" of corrosion complaints. *Id.*[8]

---

[8] The district court cases cited by the court in this matter are similarly distinguishable from the case at hand. Each of those cases dealt with an insufficiently small number of complaints, complaints posted in forums unrelated to the defendant, complaints made after the sale dates, or some combination of these circumstances. *See, e.g.*, *Fisher v. Honda North Am., Inc.*, No. LA CV13-09285 JAK (PLAx), 2014 WL 2808188, at \*5 (C.D. Cal. June 12, 2014) (finding a single consumer complaint predating the sale date did not plausibly suggest that defendant was on

Importantly, Appellees have filed a motion to dismiss, not a motion for summary judgment. Discovery has not yet occurred. The district court faulted Appellants for failing to provide specific names and dates for consumer complaints, but in doing so it ignored the context of the particular consumer complaint system alleged by Appellants. Appellants specifically allege a private internal complaint system, and describe the manner in which it functions and the individual supervisor responsible for its management. In other words, Appellants do not know names and dates precisely because these complaints are not the sort of public internet posts that courts have previously found insufficient for providing notice to a company. Pre-discovery, when the court must take Appellants' factual allegations as true, Appellants' description of a separate consumer response

---

notice of a defect); *Grodzitsky v. Am. Honda Motor Co.*, No. 2:12-cv-1142-SVW-PLA, 2013 WL 690822, at *7 (C.D. Cal. Feb. 19, 2013) (finding insufficient ten complaints submitted after sale to plaintiffs or posted to websites unrelated to defendant); *Baba v. Hewlett-Packard Co.*, No. C 09-05946 RS, 2011 WL 317650, at *3 (N.D. Cal. Jan. 28, 2011) ("Awareness of a few customer complaints . . . does not establish knowledge of an alleged defect."); *Oestriecher v. Alienware Corp.*, 544 F. Supp. 2d 964, 974 n.9 (N.D. Cal. 2008) ("Random anecdotal examples of disgruntled customers posting their views on websites at an unknown time is not enough to impute knowledge upon defendants.").

Here, by contrast, Appellants allege that individual supervisors dealt with "40 or 50" consumer complaints, an "unusual volume," as early as 2001. While the numbers "40 or 50" lack context from which the court could determine whether or not that is truly a sizable volume, YMUS's alleged response to those complaints—the establishment of a dedicated customer care center—suggests that YMUS *itself* saw this number as significant and beyond the norm. Moreover, unlike cases in which complaints were posted to online forums, here Appellants allege not only that complaints were made directly with YMUS, but that YMUS affirmatively responded to this unusual volume of complaints by instituting a dedicated customer care center.

system dedicated to handling an unusually high volume of complaints specific to premature corrosion in F-Series motors supports a claim of presale knowledge.

## B. Appellants Failed to Plead the Existence of an Unreasonable Safety Hazard

Appellants proffer two theories of unreasonable hazard resulting from the dry exhaust defect: (1) the potential for onboard fires, and (2) the risk of accident and associated injuries due to loss of steering power. However, Appellants' claim that the dry exhaust defect poses an unreasonable safety hazard fails due to Appellants' own characterization of the defect. According to Appellants' allegations, the purported defect merely accelerates the *normal and expected process* of corrosion in outboard motors. In other words, Appellants do not assert that the corrosion would not or should not occur absent the defect, they merely contend that the defect causes corrosion to occur earlier in a motor's lifetime than a consumer would otherwise expect. Were we to conclude that Appellants' allegations of premature but otherwise normal wear and tear plausibly establish an unreasonable safety hazard, we would effectively open the door to claims that *all* of Yamaha's outboard motors eventually pose an unreasonable safety hazard. The factual allegations here do not support either conclusion.

Additionally, the alleged safety risk is speculative and unsupported by factual allegations. Where a plaintiff alleges a sufficiently close nexus between the claimed defect and the alleged safety issue, the injury risk need not have come to fruition. *See Apodaca*, 2013 WL 6477821, at *9; *Ehrlich v. BMW of. N. Am., LLC*, 801 F. Supp. 2d 908, 918 (C.D. Cal. 2010). Nevertheless, a party's allegations of an unreasonable safety hazard must describe more than merely "conjectural and hypothetical" injuries. *Birdsong v. Apple,*

*Inc.*, 590 F.3d 955, 961 (9th Cir. 2009).  Here, the SAC lacks any allegations indicating that any customer, much less any plaintiff, experienced such a fire—a notable omission if the alleged unreasonable safety hazard arises in *all* Yamaha outboard motors sooner or later.

We further note that the standard is one of an "unreasonable" safety risk.  The loss of steering power, while plausibly hazardous, is a potential boating condition of which Yamaha expressly warns consumers.  Moreover, the nature of the alleged defect as being primarily one of accelerated timing rather than the manifestation of a wholly abnormal condition weighs against its characterization as "unreasonable."

Finally, the fact that the alleged defect concerns premature, but usually post-warranty, onset of a natural condition raises concerns about the use of consumer fraud statutes to impermissibly extend a product's warranty period.  *See Wilson*, 668 F.3d at 1141–42 (acknowledging that unless liability for failure to disclose a defect is limited to unreasonable safety risks, "the failure of a product to last forever would become a 'defect,' a manufacturer would no longer be able to issue limited warranties, and product defect litigation would become as widespread as manufacturing itself" (internal quotation marks and alteration omitted)).

## CONCLUSION

The district court correctly found that it lacked either general or specific jurisdiction over YMC.  Additionally, Appellants failed to state a claim for state-law consumer fraud, as they failed to adequately plead that the alleged dry exhaust defect constituted an unreasonable safety hazard. We therefore AFFIRM the district court's dismissal of YMC

as a party, and AFFIRM its dismissal of Appellants' claims against YMUS pursuant to Rule 12(b)(6).