KLEINFELD, Senior Circuit Judge, dissenting: I respectfully dissent. The majority gets the law wrong and misapplies it to the extent it is stated correctly. L This is a civil procedure case arising from uncivil conduct by lawyers in hardball litigation. Because there have been no evi-dentiary findings or hearings, the plaintiff need make only a prima facie showing of jurisdiction, “the court resolves all disputed facts in favor of the plaintiff,”, and the allegations in the complaint are for purposes .of decision assumed to be true.[1] In a now-settled Nevada lawsuit, Arizona lawyer K. Layne Morrill and his law firm represented developer Gary Tharald-son and related entities against Bradley J. Scott and his related entities. Scott and his companies were represented by J. Randall Jones and two law firms where Jones practiced. The litigation concerned alleged fraud in inducing Tharaldson to. participate in a $100 million loan to a failed Las Vegas real estate venture. Neither the fraud, the real estate, the contracts relating to the, development deal, nor Tharaldson are involved in the case before us now. Instead, this lawsuit is about the hardball litigation tactics that Jones and Scott used against Morrill and his firm. Hardball litigation occurs when attorneys depart from, the “high degree of civility and respect” on which “[o]ur adversarial system relies.”[2] Jones and Scott sought to depose Morrill and his partner Martin A. Aronson in Arizona even though Morrill and Aron-son were opposing counsel, not percipient witnesses. This tactic is often used for the sole purpose of driving a wedge between a lawyer and his client. Under the Arizona Rules of Civil Procedure at the time,[3] Jones and Scott filed a civil action in Arizona state court to subpoena Morrill and his .law partner Martin Aronson to submit to depositions. Morrill filed a motion to quash the subpoenas, or in.the alternative, for a protective order. Jones appeared pro hac vice in Arizona Superior Court to oppose the motion. In addition to the depositions, Jones and Scott filed a bar grievance in Nevada against Morrill, and in yet another lawsuit, they sued Morrill for defamation. Nominally, all of Scott and Jones’s hardball tactics failed. The Arizona court granted the motion to quash the depositions. Scott and Jones then argued before the special master in charge of discovery in the Nevada litigation to order the depositions. Upon recommendation of the special master, a Nevada trial court ordered the depositions to take place. Morrill appealed and the Nevada Supreme Court remanded the deposition proceedings, noting that seeking to make opposing counsel a witness “has long been discouraged and recognized as' disrupting the adversarial nature of our judicial system.”[4] Jones and Scott did not pursue the depositions further. The Nevada state court entered judgment for Morrill in the defamation suit, and the Nevada State Bar. Screening Panel rejected disciplinary proceedings against Morrill. But Jones and Scott won the war even though they lost all the battles. Despite the fact that each of their attacks was ultimately determined to be without merit, Jones and Scott succeeded in destroying Morrill and- his firm’s relationship with their clients. Tharaldson fired Morrill and his firm before the Nevada litigation settled. To recoup the damage Morrill and his law firm suffered, they brought four claims against Scott, Jones, and their respective firms in the District Court for the District of Arizona. The claims alleged the torts of abuse of process and wrongful institution of civil proceedings for the depositions, and wrongful institution of civil proceedings for the defamation suit and the Nevada bar grievance.[5] The district court dismissed the case for lack of personal jurisdictión. Personal jurisdiction, not the merits of the attacks on Morrill, is the issue before us. II. Arizona’s long-arm statute allows for personal jurisdiction to the maximum extent allowed by the United States Constitution.[6] Morrill does not assert that Jones and Scott have “continuous and systematic general business contacts” with Arizona that would create general jurisdiction and allow Morrill to sue Jones and Scott for any claim in Arizona.[7] Morrill contends only that' there exists specific jurisdiction, or in other words, that Jones and Scott’s conduct created minimum contacts with Arizona sufficient to enable an Arizona court to assert jurisdiction in this case.[8] We apply a three-part test to determine' if a court can exercise specific jurisdiction over a non-resident defendant: (1) The non-resident defendant must purposefully direct his-activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum-, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant’s forum-related activities; and (3) the exercise, of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable,[9] The second and third prong of this test raise no serious issue in this .case. For the second prong, the “but for” test is used to determine whether claims arise out of the contacts.[10] Here, the abuse of process and wrongful institution claims would not have occurred “but for” Jones entering Arizona to depose Morrill and Aronson, invoking the assistance of the Arizona courts, and suing Morrill for defamation. For the third prong, Jones and his firm found it worthwhile to travel and litigate the depositions in Arizona. So it is hard to imagine how it could be a denial of “fair play and substantial justice” to make them defend their actions in Arizona. To decide the first prong, we must apply yet another test. In tort cases we generally apply the “purposeful direction test,” and in contract cases we generally apply the “purposeful availment analysis.”[11] The separation is not absolute, but as this is a tort case, the purposeful direction test is generally the most appropriate. That test, derived from Calder v. Jones,[12] requires the defendant to have “(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.”[13] For the first prong, whether the defendant has committed an intentional act, all a plaintiff must show is that a defendant has an “intent to perform an actual, physical act in the real world.”[14] There were a multitude of intentional acts in this case, such as opening a civil action to compel depositions and traveling to Arizona to appear in Arizona Superior Court to compel the depositions. This prong is clearly met. The second prong, whether a defendant’s actions are “expressly aimed at the forum state,” requires more analysis.[15] The language of this prong comes from Calder, and to understand the prong it is necessary to understand the case it comes from. In Calder, actress and California resident Shirley Jones sued two Florida-based editors of the National Enquirer, a tabloid with a large California circulation, for libel.[16] The editors had few relevant contacts with California other than writing the allegedly libelous story.[17] But the Court nonetheless found that the editors had enough minimum contacts with California to establish jurisdiction there because the editors had “expressly aimed” an intentional tort at a California resident and therefore they could “reasonably anticipate being haled into court” in California.[18] Calder is not the only relevant case, however. In Walden v. Fiore the Supreme Court clarified what minimum contacts are needed with the forum state in an intentional tort case. There, Nevada gamblers had a suitcase of money seized by a Georgia police officer at the Atlanta Airport.[19] The gamblers alleged that the officer helped draft a false probable cause affidavit to support forfeiture of the money, and they filed a lawsuit in Nevada.[20] The Supreme Court reaffirmed Calder but held that the Nevada court lacked personal jurisdiction because there were not “sufficient minimum contacts” with Nevada.[21] The Court noted that the officer’s only contact with Nevada was that the gamblers happened to live there, and it concluded that “a defendant’s relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.”[22] Calder and Walden serve as bookends for determining whether a defendant has sufficient minimum contacts with, a forum state. In this case, we need not resolve whether the defendants’ conduct in Nevada, such as the defamation suit they filed against the Arizona lawyers, creates the minimum contacts needed for jurisdiction. Their conduct in Arizona plainly does. The defendants’ contacts with Arizona are stronger than those the Supreme Court held to be sufficient in Calder because of their travel to and actions in Arizona. Unlike the Florida editors in Calder who had few direct contacts arising out of the suit with California,[23] and unlike the Georgia police officer in Walden who never visited Nevada,[24] Jones and Scott had direct and extensive contacts with Arizona. Jones filed a civil action in an Arizona state court. This was not meaningless paperwork but a new civil action to obtain a subpoena to compel Arizonans to submit to depositions. When a motion to quash was filed, Jones sought pro hac vice admission in the Arizona court. He then traveled to Arizona to argue the motion. Routine matters in foreign states are often handled by local counsel. But Jones made the trip to Arizona to argue the motion himself. As the 89-page transcript shows, the argument was no formality. It was a lengthy and substantial adversarial hearing, in which Jones must have invested considerable effort. Had Jones succeeded in defeating the motion to quash, he would have spent hours or days deposing Morrill and Aronson in Arizona. Such extensive contacts are more than enough to satisfy the second prong and show that Jones and Scott expressly aimed their actions at Arizona. Finally, for the third prong of the purposeful direction test, a defendant must know the harm was “likely to be suffered” in the forum state.[25] This prong can be met even if “the bulk of the harm” occurs outside the forum so long as the defendant knew that some harm would occur in the forum state.[26] While Scott and Jones may have been motivated by the Nevada litigation, they used an Arizona court to direct harm at Arizona lawyers in Arizona. Using hardball litigation tactics, such as deposing opposing counsel to drive a wedge between a firm and client, can damage not only a firm’s business but also its reputation. Word of a firm losing its client in a multimillion-dollar litigation is likely to spread and cause lasting damage. We have held that economic and reputational loss to a law firm are foreseeable harms felt in the law firm’s home state.[27] Thus, much as the National Enquirer editors , in Calder could foresee the emotional harm and reputation damage to the California actress from their false story,[28] Jones and Scott could foresee the economic and reputational damage to Morrill in Arizona. Because all three prongs of the purposeful direction test are met,- the remaining prong of the minimum contacts test is met. The district court -therefore erred in findr-ing that it could not exercise personal jurisdiction over Scott and Jones. III. The majority creates a new and erroneous legal rule: if the plaintiff has acted ,in the defendant’s state, and if the “driving force behind” the defendant’s conduct arises from litigation elsewhere,[29] then the courts of'the plaintiffs state, lack jurisdiction over the defendant, despite the defendant’s travel to and, conduct in the plaintiffs state. Even .filing a lawsuit in the courts of the plaintiffs state and traveling ■there to litigate it will not, under the majority’s view,-suffice for jurisdiction there. There is no support in the case law for the majority’s new rule. The majority creates this erroneous rule because it focuses on the “driving force behind”'the defendants’ conduct, the so-called “framework” for the conduct, rather than on the defendants’ contacts with the state'of Arizona.[30] Analogizing this case to Walden, the majority discusses the purpose of the contacts listed in the complaint rather than the contacts themselves: According to Plaintiffs, all of these alleged actions had a common and improper púrpose-to gain an advantage for Defendants and their clients in the Tharaldson Litigation that was proceed•ing in- Nevada. ... [T]he driving force behind Defendants’ actions-the ongoing litigation in Nevada- .... provides the framework within which the actions occurred and the foreseeable harm would result.[31] The defendants’ contacts with Arizona were indeed related to the plaintiffs’ conduct in. the Nevada lawsuit. And Walden does hold that a “plaintiff cannot be the only link between the defendant and the forum.”[32] But in our -case, Morrill was far from the “only link” with the forum. The defendants developed sufficient contacts with the state of Arizona by filing a civil action in Arizona, traveling to Arizona, appearing pro hac vice in an Arizona court, and arguing the new case in an adversarial hearing. Nor was the foreseeable harm caused by defendants limited to the Nevada litigation as the majority seems to suggest.[33] The foreseeable harm of defendants’ conduct included economic effects in the state of Arizona as well as reputational loss to the plaintiffs in Arizona.[34] The defendants’ conduct was designed to harm the'Arizona plaintiffs in Arizona. And that harm—destroying the Arizona plaintiffs’ relationship with their client and damaging their professional reputation-—foreseeable would be felt in Arizona, even if it was only a means to an end (winning the Nevada lawsuit) from the viewpoint of Scott and Jones.' Walden offers no support for disregarding connections to the forum state, as the majority does, because of their relationship to a plaintiff’s conduct elsewhere. If because of something you were doing to me in Nevada, I traveled to Arizona and threw a rock through your window, my conduct’s relationship to Nevada does not deprive an Arizona court of jurisdiction over your tort action—even if the “driving force behind” what I did to you was for the purpose of gaining an advantage over you in Nevada, and even if what you did to me in Nevada “providefd] the framework within which” I threw the rock.[35] The majority's new rule also finds no basis in Supreme Court precedent interpreting Walden. In Bristol-Myers Squibb Co. v. Superior Court of California, the Supreme Court summarized Walden as concerning a defendant’s lack of contacts, not the “framework” within which they occurred: In [Walden], Nevada plaintiffs sued an out-of-state defendant for'conducting an allegedly'unlawful search of the plaintiffs while they were in Georgia preparing to board a plane bound for Nevada. We held that the Nevada courts lacked specific jurisdiction even- though the plaintiffs were Nevada residents and “suffered foreseeable harm in Nevada.” Because the “relevant conduct occurred entirely in: Georgia] ... the mere fact -that [this] conduct affected plaintiffs with connections to the forum State d[id] not suffice to authorize jurisdiction.[36]. Nor is there any justification for the majority’s rule in the two published cases interpreting Walden in this circuit. In Williams v. Yamaha Motor Co. Ltd.,[37] we summarized Walden as concerning the extent of a defendant’s contacts, not the “framework” within which they occurred: [Walden] dealt with the scenario in which the connection between the defendant and the forum was provided only by the plaintiff, and could aptly be-described as “random, fortuitous, or attenuated.”[38] And in Picot v. Weston, we applied Walden and found no jurisdiction because the defendant committed all of his tortious conduct out of state with no meaningful-contacts with -the forum state.[39] Nowhere in Williams or Picot was the purpose for contacts analyzed, nor were substantial in-forum contacts disregarded because of an o'ut-of-forum “framework.” The majority’s new rule creates at least an implicit circuit split with the Sixth Circuit. In MAG IAS Holdings Inc. v. Schmückle,[40] a Michigan company sued a German resident who was CEO of its parent company. The German resident invoked Walden and argued that “because he targeted his conduct only at plaintiffs and not at Michigan itself’ there'was'no jurisdiction.[41] The Sixth Circuit rejected this view and held that “Walden simply holds that an out-of-state injury to a forum resident, standing alone, cannot constitute purposeful availment.”[42] “It would severely limit the availability of personal jurisdiction if every defendant could simply frame his conduct as targeting only the plaintiffs and not the iorum state.”[43] In SchmücHe and in our case, the oüt-of-state injury to the forum resident did not “stand alone.” So we should, as the Sixth Circuit did, conclude that Walden is distinguishable. When the majority does get to discussing the .defendants’ contacts with Arizona (rather than their “driving force” or the “framework within which” they occurred),[44] it .characterizes them as a “component part” of the plaintiffs’ conduct.[45] The-majority relies on an. incorrect premise: that , Scott’s and Jones’s filing of a new lawsuit in Arizona state court to depose plaintiffs was a “component part” of the parties’ ongoing litigation in Nevada.[46] It was not. Accepting plaintiffs’ allegations as true, as we must at this stage,[47] the defendants’ conduct was an illegitimate use of the Arizona court system to harm plaintiffs by driving a wedge between plaintiffs and their clients. Courts in Arizona and Nevada acknowledged as much when they erected hurdles to the defendants’ Arizona depositions so that the depositions were never taken. While the Nevada lawsuit may have been the impetus for the defendants’ conduct, their contacts—filing a civil action in Arizona, traveling to Arizona, appearing pro hac vice in an Arizona court, and arguing a new case in an adversarial hearing— were not “limited and ancillary” as the majority suggests.[48] Certainly the lawyers’ fees stemming from all of this work in Arizona would not be small. And Walden stressed that “physical presence within the territorial jurisdiction,” such as Jones entering Arizona to commit the alleged tort in this case, is “certainly a relevant contact.”[49] So, although the Arizona conduct may have been the tail of the dog, it was a very big dog with a very big tail. I do not understand the majority’s argument that the defendants’ conduct established only “the potential foreseeability of some incidental harm to Plaintiffs in Arizona.”[50] We have held that the economic and reputational loss to a law firm occurs in that firm’s home state.[51] There is nothing “incidental” about filing a new lawsuit, creating a rift between attorney and client, causing a client to fire his lawyer in the middle of litigation, causing a lawyer to lose a major client in a huge case, and causing both economic and reputational harm in the process. While Morrill may have suffered harm in Nevada, that does not negate the harm defendants directed at Morrill in Arizona using the Arizona courts. It is not required that a plaintiff suffer all of the harm in the forum state.[52] Trial lawyers say of hardball litigation, “live by the sword, die by the sword.” Yet Scott and Jones avoid the jurisdictional consequences of both their Arizona-directed conduct and their conduct in Arizona. Scott’s and Jones’s decision to bring the fight to Morrill and his firm in Arizona by availing themselves of the Arizona state courts subjected them to jurisdiction in Arizona to determine if their hardball litigation tactics were tortious. The majority’s opinion today not only allows Scott and Jones to use the Arizona legal system against an Arizona resident yet avoid being held accountable in Arizona, but it will also deprive future plaintiffs of the ability to sue in the forum to which a defendant has traveled to do them harm. It is mistaken. The majority’s “driving force” and “framework” test enables a tortfeasor to evade jurisdiction where his actions or their consequences occur, so long as the tortfeasor’s purpose is to use the tort as a means to his own end that will occur elsewhere. . In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 741 (9th Cir. 2013) (quoting Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir, 2006)); Sher v. Johnson, 911 F.2d 1357, 1360-61 (9th Cir. 1990) (noting the court assumes allegations as true for purposes of determining jurisdiction), . Ahanchian v. Xenon Pictures, Inc., 624 F.3d 1253, 1263 (9th Cir. 2010). . The relevant rule at the time, former Arizona Rule of Civil Procedure 30(h), stated; When an action is pending in a jurisdiction foreign to the State of Arizona and a party or a party’s attorney wishes to take a deposition in this state, it maybe done.and a subpoena or subpoena duces tecum may issue therefor from the Superior Court of this state. The party or attorney shall file, as a civil action, an application, under oath, captioned as is the foreign action .... Former Ariz. R. Civ, P. 30(h). Arizona now conforms its rules to the Uniform Interstate 'Depositions and Discovery Act along with 36 other states. Unif. Interstate Depositions & Discovery Act (2017). . Club Vista Fin. Servs., L.L.C. v. Eighth Judicial Dist. Court, 276 P.3d 246, 248 (Nev. 2012) (quoting Shelton v. Am. Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986)). . Morrill later acknowledged that 'the bar grievance claim was barred by Nevada law. See Nev. S. Ct. Rule 106(1) ("All participants in thé discipline process, including grievants, bar counsel staff, members of disciplinary panels, diversion and mentoring participants, and witnesses, shall be absolutely immune from civil liability. No action may be predicated upon the filing of a disciplinary complaint or grievance or any action taken in connection with such a filing by any of the participants.”). . Ariz. R. Civ. P. 4.2(a) (2016). . See Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801-02 (9th Cir. 2004). . See Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414, n.8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). . Schwarzenegger, 374 F.3d at 802 (quoting Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987)). . Menken v. Emm, 503 F.3d 1050, 1058 (9th Cir. 2007). . Schwarzenegger, 374 F.3d at 802. . 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). . Schwarzenegger, 374 F.3d at 805 (quoting Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002)). . Picot v. Weston, 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting Schwarzenegger, 374 F.3d at 806). . Id. . Calder, 465 U.S. at 784, 104 S.Ct. 1482. . Id. at 784-86, 104 S.Ct. 1482. . Id. at 789-90, 104 S.Ct. 1482 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). . Walden v. Fiore, — U.S. —, 134 S.Ct. 1115, 1119, 188 L.Ed.2d 12 (2014). . Id. at 1119-20. . Id. at 1123-24. . Id. . Calder, 465 U.S. at 784-86, 104 S.Ct. 1482. . See Walden, 134 S.Ct. at 1119-20. . Collegesource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079 (9th Cir. 2011) (quoting Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1128 (9th Cir. 2010)). . Brayton Purcell LLP, 606 F.3d at 1131 (quoting Yahoo! Inc. v. La Ligue Contre Le Racisme Et L’Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc)). . See id. . Calder, 465 U.S. at 789-90, 104 S.Ct. 1482. . See Maj. op. at 1145. . Maj. op. at 1145-46. . Maj. op, at 1145. . Walden, 134 S.Ct. at 1122. . Maj. op. at 1145-46. . Cf. Brayton Purcell LLP, 606 F.3d at 1131. .Contra Maj. op. at 1145-46. . — U.S. —, 137 S.Ct. 1773, 1781-82, 198 L.Ed.2d 395 (2017). . 851 F.3d 1015 (9th Cir. 2017). . Id. at 1023-24 (quoting Walden, 134 S.Ct. at 1123). . 780 F.3d 1206, 1214-15 (9th Cir. 2015). . 854 F.3d 894 (6th Cir. 2017). . Id. at 901. . Id. . Id. . Maj. op. at 1145, . Maj. op. at 1144-45, 1145-46, 1148-49. . See id. . Sher, 911 F.2d at 1360-61. . Maj. op. at 1148-49. . Walden, 134 S.Ct. at 1122. . Maj. op. at 1144-45. . See Brayton Purcell LLP, 606 F.3d at 1131. . Id.